THE PEOPLE OF THE STATE OF NEW YORK, Respondent, *v.*
WILLIAM H. DRAPER, Appellant.

Fourth Department, May 18, 1951.

*Clarence J. Henry, District Attorney (Harry L. Rosenthal* of counsel), for respondent.

*Herbert W. Lacy* and *Leon N. Armer* for appellant.

KIMBALL, J. The appellant, William H. Draper, was convicted in the County Court of Monroe County of the crime of murder in the first degree for the homicide of one Jennie O'Keefe. Upon the recommendation of the jury, the court sentenced appellant to life imprisonment. The appeal from the judgment of conviction brings up for review all questions of fact and of law brought out upon the trial, including the rulings of the court, the statements of the District Attorney, the charge to the jury and, generally, whether the appellant was given a fair trial in accordance with the law of the State.

The indictment contained one count only and that was one of common-law murder in the first degree. The indictment reads: "The defendant, on or about July 17, 1949, at the Town of Greece, Monroe County, New York, wilfully, feloniously and of malice aforethought killed one Jennie O'Keefe by striking and beating her on the head and body with his hands and fists thereby inflicting injuries which caused the death of said Jennie O'Keefe."

The evidence was amply sufficient to satisfy any reasonable person that the appellant, during the night of July 16th, transported the deceased in his automobile to a more or less isolated spot on Mill Road in the town of Greece, Monroe County; that not far from the road, the appellant brutally and horribly beat

and pounded Mrs. O'Keefe, without use of any weapon and that she died at an undetermined time thereafter as a direct result of such beating. Her dead body was found early on July 17th, on a lawn on Ridge Road in the county of Monroe in a partial state of undress. The body was removed to the Rochester morgue. The morning of July 17th, articles of clothing and personal effects of the deceased, including her girdle and false teeth, were found at or near a trampled area adjacent to Mill Road. Also there found was a wallet of the appellant containing some bills, car license and a slip of paper given to him previously by a policeman. In the early evening of July 17th, Draper was apprehended while driving his car in the village of Brockport and was taken to the morgue where he was questioned by the District Attorney and the Sheriff.

The appellant, who was a young man of about twenty-nine years of age, at first told the officials of meeting Mrs. O'Keefe, aged about seventy-three years, in a tavern and that he offered to take her home; that he left her at about 9:30 P.M. on a street corner near her residence. He said he had lost his wallet some days before. Later, however, on further questioning, he told of driving deceased to Mill Road; that he had in mind having intercourse with her and then taking her back; that she objected and that was "when the trouble started". He said she got out of the car. He admitted hitting her but did not account for the terrible beating which took place. He said he put her back in the car and drove around for some time; that he thought she was overcome by beer which she had been drinking. Draper was seen pushing his car at about 4:00 A.M. of the 17th on Ridge Road near Hoover Road so it was about that time that, as he told the officials, he placed deceased's body on the lawn at the location where it was found.

Horrible, brutal and apparently senseless as the beating was by which this appellant brought about the death of this aged woman, this court may not affirm the judgment convicting him of murder in the first degree if it appear that errors prejudicial to the substantial rights of the defendant were made during the course of the trial and if it appear that under the applicable rules of law governing murder trials, questions of fact relating to the degree of homicide and the guilt or innocence of the defendant were decided by the court and not submitted for the determination of the jury. The duty of this court is not discretionary in such case "but in obedience to the command of law." (*People* v. *Bonier,* 179 N. Y. 315, 325.) In differentiating between technical and substantial errors, it was said in *People v.*

*Mleczko* (298 N. Y. 153) '' if the court believes that the errors may have misled the jury, may have influenced the verdict, then the error may not be deemed technical, and a reversal will follow — even though the court may conclude that the jury properly decided the case on the evidence adduced.'' (P. 162.) It was further said in the *Mleczko* case: '' Vicious though the crime was, convincing though the evidence of guilt may seem to be, we could affirm only if we were to announce a doctrine that the fundamentals of a fair trial need not be respected if there is proof in the record to persuade us of defendant's guilt. We are not prepared to announce such a doctrine. [Citing *People* v. *Marendi*, 213 N. Y. 600.] It is for jurors, not judges of an appellate court such as ours, to decide the issue of guilt.'' (P. 163.) See, also, *People* v. *Samuels* (302 N. Y. 163, 173) where a first degree murder conviction was unanimously reversed and where the court said: '' Whatever we may think of his connection with the crime, he was entitled to a fair trial according to law.''

A review of the record in this case, convinces us that there were errors of which some might be considered as '' technical '' under section 542 of the Code of Criminal Procedure and therefore not regarded as seriously affecting the substantial rights of the defendant. There are, however, other errors which are of such a serious nature, which go to the fundamentals of the charge of the indictment, and which could not have failed to influence the jury in its verdict, that they must be held to be a denial to the defendant of his rights. Three such errors are apparent.

The plea to the indictment was one of not guilty. A plea of insanity, as a specification under the plea of not guilty, was not interposed pursuant to section 336 of the Code of Criminal Procedure. That did not foreclose proof of insanity upon the trial as a defense. (*People* v. *Joyce,* 233 N. Y. 61.) The defendant did not testify. The defense was the insanity of the defendant at the time of the commission of the crime. If his act was done while insane, it was not a crime. The defendant was to be excused from criminal liability if he was laboring under such a defect of reason as '' 1. Not to know the nature and quality of the act he was doing; or, 2. Not to know that the act was wrong.'' (Penal Law, § 1120.) The question as to whether the defendant was sane or insane within the provisions of section 1120, was, in certain respects, the main issue on the trial. Proof of insanity following the commission of the crime is relevant upon

the issue of insanity at the time of the commission of the crime. (*People* v. *Esposito,* 287 N. Y. 389, 396.) While we might disagree with the jury's finding of sanity, still that question was one of fact peculiarly within the jury's province and if there were nothing more than that to be reviewed, we would hesitate to reverse on the ground that the verdict was against the weight of evidence and we do not do so. However, the fact question of sanity or insanity being a predominant issue and there being such substantial evidence both ways, it became most essential that the rights of the defendant on that issue be guarded with great care in accordance with the law to the end that nothing relevant be kept from the jury and that nothing irrelevant or incompetent by the rules of evidence or by statute be received.

Subsequent to the arrest of the defendant, an order was made committing him to the Rochester State Hospital for examination as to his then mental condition (Code Crim. Pro., § 870 *et seq.*). The director of the hospital appointed two psychiatrists, Dr. Feldman and Dr. McIntosh, to conduct the examination. The defendant was in the hospital about six weeks and on September 16, 1949, the psychiatrists made a report that the defendant " is not at this time in such a state of idiocy, imbecility or insanity as to be incapable of understanding the charge against him or the proceedings or of making his defense." In the meantime, the indictment had been found and sent to Monroe County Court for disposition. On defendant's application, a hearing was had before said County Court on November 16, 1949. (Code Crim. Pro., § 662-a.) At the hearing, Dr. Libertson, for the defendant, testified that he was insane — dementia praecox, paranoid type. The court held that the findings of the report had not been successfully controverted and that the defendant should stand trial.

Upon the trial, counsel for the defendant moved for the production of the records of the State Hospital " for use as evidence in this case." Whether these records were then in court does not appear. In any event, the District Attorney objected on the ground that the hospital records were inadmissible as evidence upon the trial by virtue of section 662 of the Code of Criminal Procedure. That section directs the superintendent of the hospital, upon completion of the examination, to transmit to the court " a full and complete report including the findings of the qualified psychiatrists who have conducted the examination " and further provides : " The report of the psychiatrists made pursuant to this section shall not be received in evidence

upon the trial of the defendant but shall be filed by the court in the office of the clerk of the court where it shall be subject to inspection only on the order of the court or a justice thereof.'' The court sustained the objection of the District Attorney, thus ruling that the hospital records covering about six weeks of the defendant's life after the commission of the crime and while under observation, could not be received in evidence upon the trial on behalf of the defendant. This was error and the issue being the mental condition of the defendant when the crime was committed, it was substantial and reversible error. The day to day account of the actions and reactions of the defendant as kept by the hospital was very relevant and important as bearing upon defendant's sanity or insanity at the time of the commission of the crime. Keeping these records from the jury for their consideration deprived the defendant of a substantial right. Who can say what influence the records might have had upon the jury's determination of the sanity or insanity of the defendant? The only reason advanced for the rejection of this evidence is section 662 of the Code of Criminal Procedure. All that section prohibits as evidence upon the trial, is the report of the psychiatrists. The hospital records are not mentioned. We know of no authority which sustains the ruling of the court. We cannot, by any logical process of reasoning, distinguish between the admissibility of the records of a hospital where a defendant is confined for examination as here and the records of any other hospital where the defendant may have been a patient, voluntary or involuntary.

A case, similar factually to this case, was recently decided by the Court of Appeals. (*People* v. *Samuels*, 302 N. Y. 163, *supra*.) The defendant was convicted of first degree murder for beating and strangling a woman to death. The defense was insanity at the time of the commission of the crime. At issue also was his mental condition at the time of alleged confessions. Defendant had been committed to Bellevue Hospital for psychiatric examination and thereafter to Matteawan State Hospital for fifteen months until he was returned for trial. The hospital records of both hospitals were admitted in evidence for the limited purpose of " ' facilitating the questioning of the experts ' '' but were not to be exhibited to the jury " ' unless the defendant should desire otherwise.' '' (P. 168.) Two psychiatrists were called by the People and were asked hypothetical questions which took into consideration the hospital records. They stated that defendant knew the nature and quality of the

act and that the act was wrong. The Court of Appeals said: " In the face of such evidence, the question as to defendant's sanity at the time of the alleged confessions (*People* v. *Joyce,* 233 N. Y. 61) as well as at the time of the commission of the crime (Penal Law, § 1120) presented a grave issue in the case, and *the hospital records assumed an important role.*" (P. 170.) (Emphasis mine.) The hospital records were not submitted to the jury and the court held that it was reversible error not to do so where the experts had considered such records when answering the hypothetical questions. The fact that the defendant did not request that the records go to the jury was immaterial. " It was not up to the defendant to cure the People's defective hypothetical question by putting the records before the jury." (P. 172.) In the present case, the court refused to receive the hospital records for any purpose. In the *Samuels* case, the court pointed out certain documents which were no part of the hospital records and should not have been received as such. That may always be taken care of by the trial court and could have been done in the present case. But as was said in the *Samuels* case, " Had these hospital records been properly before the jury, as they should have been before the hypothetical question was posed, its verdict might well have been different." (P. 172.) The Court of Appeals reversed the judgment of conviction. No claim was made that section 662 of the Code of Criminal Procedure in any way governed the admissibility of the records.

While we hold that the hospital records were improperly rejected, we agree that section 662 of the Code of Criminal Procedure forbids the reception in evidence of the report of the psychiatrists. In spite of the fact that, relying on said section and at the insistence of the District Attorney, the hospital records were rejected, the District Attorney was permitted to place the substance of the report of the psychiatrists before the jury by indirection. We think that it was reversible error to permit the People to place before the jury the findings of the psychiatrists who were appointed for the purpose of ascertaining whether the mental condition of the defendant was such that he could stand trial. That question was not an issue upon the trial and, obviously, the Legislature by section 662 of the Code of Criminal Procedure intended that the findings of the psychiatrists and the decision of the court as to a defendant's ability to stand trial, should not be before the jury whose duty it was to pass upon his mental condition at the time of the commission

of the crime, i.e., whether he knew the nature and quality of his act or that the act was wrong as well as to pass upon the mental condition of the defendant at the time he made a confession. The District Attorney was permitted to bring out by his questioning of Dr. Libertson the findings of the psychiatrists who examined the defendant under court order to determine his capacity to stand trial. The following took place, over the defendant's objection, upon the cross-examination of Dr. Libertson by the District Attorney:

" Q. I will have to rephrase the question, you know the defense in this matter endeavored to controvert or upset the findings of the Rochester State Hospital before Judge O'MARA sitting as a Monroe County Judge, do you not?

" A. I know that.

" Q. And on that occasion you testified that in your opinion this defendant was insane?

" A. I did.

" Q. And you know further, do you not, doctor, that Judge O'MARA did not follow your opinion in that matter, and did not uphold the contravention? [*Sic* in record — probably ' contention '.]

" A. I know that, that is a matter of record."

Again, despite the fact that the District Attorney was successful in keeping out the hospital record, he stated on summation to the jury: " We unfortunately are prevented by the law from going into what went on in the State Hospital during this six weeks, but I think you can deduce that the result was certainly that this defendant was discharged as sane or he could not have been here standing trial. * * * So that your deduction is, ladies and gentlemen, that at the end of the six weeks he was discharged by Dr. Feldman as not being insane. Don't, however, be misled, as has been suggested by the defense, into the mistake of avoiding the doing of an unpleasant duty here by any idea that you can return a verdict of not guilty by reason of insanity and, coupled with it, an insurance that this defendant will remain out of society. That doesn't follow. *One State Hospital has already issued him forth as sane.*" (Emphasis supplied.)

These remarks were objected to by the defense as being highly prejudicial. We agree that they were. They were not stricken out nor was the jury directed to disregard them.

There are other errors presented by this record but we do not deem it necessary to point them out except the refusal of

the trial court to submit to the jury the lesser degrees of homicide. There was only one count in the indictment and that was for common-law murder " by striking and beating her on the head and body with his hands and fists thereby inflicting injuries which caused the death of said Jennie O'Keefe." Throughout the trial, the theory of the People was that of a felony murder and not one at common law. The People sought to prove that the defendant killed the deceased while engaged in rape or attempted rape upon deceased. The defendant in his confession did not admit rape nor did the physician who performed the autopsy testify to it. Whether Jennie O'Keefe was beaten to death while the defendant attempted to rape her; whether he did rape her or attempt to rape her; whether the beating preceded the rape or the attempt; whether the killing took place subsequent to the alleged rape or attempted rape and after the termination of a rape or attempted rape; whether the defendant was in a mental state at the time to form an intent to commit rape; whether the homicide was the result of rage at deceased's refusal to submit; whether, if the jury found there was a rape or attempted rape, the homicide occurred after the act or the attempt, through fear of discovery were all questions for the jury to pass upon. The defendant could only be found guilty of a felony murder if the homicide occurred during the commission of the underlying felony. If the homicide occurred or resulted from a plain assault upon the woman, there would be no felony murder. The assault would have been merged in the homicide. (*People* v. *Hüter*, 184 N. Y. 237; *People* v. *Spohr*, 206 N. Y. 516; *People* v. *Wagner*, 245 N. Y. 143; *People* v. *Luscomb*, 292 N. Y. 390.) It was for the jury to say whether the beating of Mrs. O'Keefe which resulted in her death, took place while defendant was committing an independent felony or, on the other hand, whether death resulted from an ordinary assault with hands and fists as charged in the indictment. These questions were taken from the jury when the court charged: " Under the view that I take of the facts in this case as disclosed by all the evidence in the case, I shall only submit to you murder in the first degree, because in my judgment, if the crime was not committed in that way, there is a failure of proof that it was committed in any other way."

The jury was forced into the position of finding defendant guilty of murder in the first degree or not guilty. This was prejudicial error. Upon the evidence in the record and including all of it pertaining to the mental condition of the defendant,

it was for the jury to determine whether defendant was guilty of first degree murder, second degree murder or first degree manslaughter or not guilty. There is no question but that he caused the death of Jennie O'Keefe. The evidence impels the conclusion that defendant, unless found insane, was guilty of some degree of homicide. The jury was not permitted to pass upon the facts in evidence to determine the degree of the crime charged which was first degree common-law murder only.

In *People* v. *Schleiman* (197 N. Y. 383) the indictment charged both common-law and felony murder in two counts. The court gave the case to the jury on the felony murder count only and the Court of Appeals sustained the conviction under the facts of that case. The court, however, sounded a warning at the same time by saying: "The conditions are exceptional, however, which warrant a refusal to instruct the jury as to their power to convict of a lower degree of the crime charged for which the defendant is upon trial and great care should be observed, as was done here, not to withhold such instruction unless the case is one like that before us, where there is no possible view of the facts which would justify any other verdict except a conviction of the crime charged or an acquittal." (P. 390.)

This caution to trial judges has been repeated by the Court of Appeals in *People* v. *Koerber* (244 N. Y. 147); *People* v. *Moran* (246 N. Y. 100) and *People* v. *Cummings* (274 N. Y. 336). Judge CARDOZO said in the *Moran* case (pp. 103, 105): "If, however, the facts are susceptible of varying interpretations, there must be a submission of whatever forms and grade comport with the proofs and the indictment. * * * Whenever intent becomes material, its quality or persistence — the deranging influence of fear or sudden impulse or feebleness of mind or will — is matter for the jury if such emotions or disabilities can conceivably have affected the thought or purpose of the actor. * * * Evidence uncertain in its implications must not be warped or strained to force a jury into the dilemma of choosing between death and freedom."

In *People* v. *Cummings* (*supra*, pp. 337–338, 339) the Court of Appeals again laid down the rule. It was there said: "Where the evidence is so substantial as to put in question the mental capacity of the defendant to form an intent to commit the felony, the degrees of homicide should be and must be charged. Only where there is no question of fact as to the killing while in the commission of a felony can the various degrees of homicide

safely be omitted.  *  *  *  If the evidence shows the defendant to have been intoxicated or his mentality so impaired or weakened as to call in question his ability to have formed an intent, then the degrees of homicide must be charged.''

In the instant case, the only charge in the indictment was that of first degree common-law murder. The defense was largely based upon the theory of the insanity of the defendant. The mental capacity of the defendant was in issue as was also the question as to whether the beating occurred during the commission of an underlying felony. The statute requiring the submission of the lower degrees of the crime charged was not complied with. While the defendant did not except to the charge-in-chief which left to the jury only the alternative of guilty of first degree murder or acquittal, a request was made for a charge in reference to manslaughter in the first degree. This charge was refused, the court saying '' that from all the evidence it would appear the crime could not have been committed in any other way than Murder in the First Degree.'' An exception was taken to the refusal to charge as requested. The question of lesser degrees of homicide was sufficiently brought to the attention of the court.

It is our opinion that the fundamental and substantial rights of this defendant were not preserved and protected and that the judgment of conviction should be reversed and a new trial had.

All concur, except TAYLOR, P. J., who dissents and votes for affirmance, in the following memorandum: Under section 542 of the Code of Criminal Procedure the errors, if any, committed on the trial were not sufficiently prejudicial to defendant to warrant reversal. The facts sustain the findings of the jury, implicit in the verdict, that defendant killed his victim while engaged in the commission of the felony of rape or attempted rape upon her person and that he was not legally insane at the time of the commission of the crime. The theory upon which the case was tried and the proofs adduced upon the trial justified the submission only of the questions of felony murder and legal insanity. (See *People* v. *Brookins,* 296 N. Y. 544 and *People* v. *Samuels,* 302 N. Y. 163.) Present — TAYLOR, P. J., McCURN, KIMBALL, PIPER and WHEELER, JJ.

Judgment of conviction reversed on the law and a new trial granted.