OPINION OF THE COURT
Rena K. Uviller, J.
Defendant, a former firefighter, was charged with the mur *188 der of Dr. Peter Rizzo, who was chairman of the Medical Review Board of the city’s Fire Department Pension Fund. The defendant shot Dr. Rizzo at close range with a sawed-off shotgun moments after learning that the Medical Board had refused to upgrade defendant’s disability pension.
The defendant interposed an insanity defense. An in limine motion sought to limit the scope of a prosecution psychiatrist’s trial testimony offered to refute the defendant’s affirmative defense. The motion posed several unresolved evidentiary issues raised in the wake of the codification of procedures relating to psychiatric examinations and counsel’s role at such examinations. Because of the limited appellate authority in this area and the likelihood these questions will recur, this opinion elaborates upon my rulings.
Specifically, the defendant sought to prevent a prosecution psychiatrist, retained to examine him regarding his criminal responsibility at the time of the crime, from reviewing reports regarding his fitness or competence to stand trial (compare, CPL 250.10 [3], and CPL art 730).[1] The defendant argues that if this psychiatrist reviews the article 730 reports he would indirectly and impermissibly convey their substance to the jury; that a jury passing upon criminal responsibility must not learn that a defendant has been found mentally competent to stand trial. (People v Roth, 11 NY2d 80.) Alternatively, the defendant seeks to preclude the psychiatrist’s trial testimony altogether, as well as any prospective testimony from the competency examiners.
The broader questions concern the nature of psychiatric evidence which may be introduced by either side in an insanity case and the constitutional, statutory, and evidentiary limits upon its receipt.
FACTS
Shortly after this arraignment, Mr. McNamee was examined to determine his fitness to stand trial. Although he was found competent, he was transferred to Bellevue Hospital because of a variety of physical ailments. He also had a *189 history of mental illness, including past psychiatric hospitalizations. The defendant remained at Bellevue for 16 months where he underwent surgery, received other medical treatment and incidently received some psychiatric care. Throughout his stay at Bellevue he was inevitably observed by hospital personnel, both medical and psychiatric. A second article 730 examination again found him competent to proceed.
During those 16 months, three psychiatrists retained by the defense and one retained by the prosecution examined the defendant regarding his insanity claim; notwithstanding his competence to stand trial, all four doctors concluded that at the time he shot Dr. Rizzo, Mr. McNamee was not criminally responsible. At various court appearances during that same time period defendant’s behavior was unremarkable and did not contradict the two article 730 reports concluding he was fit to proceed. As a trial date approached, however, the defendant claimed to hear voices and stated that he was being followed and persecuted. At his attorney’s request, a third article 730 examination at Bellevue Hospital was ordered. It is this final article 730 report which the defendant wishes to keep from the jury’s consideration.
In that final article 730 report the examining physicians again concluded that the defendant was fit to proceed but that he was now feigning hallucinations in an effort to avoid trial; that he had a manipulative personality through which he persistently sought advantages for himself. Further, the hospital records of defendant’s 16-month stay at Bellevue contained references by nurses and social workers attesting to defendant as manipulative and demanding; that he invoked physical and psychiatric complaints in order to secure special considerations. Also, that defendant evinced no psychiatric disorders when he was unaware of being observed on the ward. This malingering view of defendant was likewise expressed in his Rikers Island records, where he was detained for several weeks both before and after his Bellevue hospitalization.
With the trial date approaching, the People now seek to retain yet another psychiatrist to examine defendant regarding his insanity defense. It is this last psychiatrist whom the defense wishes to preclude from reviewing the most recent article 730 report which characterizes defendant as a malingerer. The defense also seeks to preclude the various article 730 examiners from rendering a trial opinion regarding defendant’s mental condition at the time of the crime.
*190 The defendant asserts that the Sixth Amendment as well as the Criminal Procedure Law accords him a right to counsel at any examination regarding his criminal responsibility (CPL 250.10 [3]). Inasmuch as he had no counsel at any of the article 730 exams, he argues that a jury passing on his sanity at the time of the crime must not be permitted to learn of the article 730 results either directly or indirectly; second, that the use of article 730 material at trial violates due process because he had no notice that what was said during article 730 examinations could be used to refute his insanity defense. Finally, defendant contends that the only admissible psychiatric evidence is that gleaned from psychiatric examinations conducted in strict conformity with CPL 250.10 (3) and that an article 730 examiner may not render an opinion about sanity.
STATUTORY HISTORY
The historical relationship between fitness and sanity examinations stems from a common statutory antecedent, section 658 of the former Code of Criminal Procedure. That statute provided broadly for court-ordered examinations as to "sanity”. Although the procedures prescribed in the Code dealt only with trial fitness, the general language of the statute accommodated examinations for criminal responsibility as well.[2] Thus, under the old Code, opinions about a defendant’s mental state at the time of the crime were permitted from psychiatrists who had examined and treated defendants during hospital commitments which ostensibly were intended to assess fitness to stand trial. (People v DiPiazza, 24 NY2d 342; People v Butchino, 13 AD2d 183; People v Draper, 278 App Div 298, affd 303 NY2d 653.)
When the Code was superseded in 1970 by the present statute, section 658 et seq. of the former Code of Criminal Procedure were supplanted by article 730 of our present Criminal Procedure Law. Article 730 is concerned expressly and exclusively with the procedures to determine fitness to proceed. It provides, inter alla, for the method of fitness *191 examinations (CPL 730.20); who may conduct them (CPL 730.10 [5], [6], [7]); and the use to which information gleaned from them may be put (CPL 730.20 [6]). Article 730 does not accord the defendant a right to counsel at fitness examinations but gives the court discretion to permit the defendant’s psychiatrist to attend. (CPL 730.20 [1].)
At the time of its enactment the CPL contained no provisions for examinations to assess a defendant’s mental condition at the time of the crime. It was not until 1980 that the Legislature, in response to evolving constitutional parameters regarding the insanity defense, enacted procedures to evaluate criminal responsibility, as distinguished from fitness. (CPL 250.10 [3]; see, People v Al-Kanani, 26 NY2d 473; Matter of Lee v County Ct, 27 NY2d 432.) The 1980 amendment provides that once a defendant enters a not responsible plea and serves notice of intent to offer psychiatric evidence at trial, the prosecution may, upon application to the court, have its own expert examine the accused. (CPL 250.10 [3].) The defendant does have a right to counsel at this sanity examination, but only as a passive observer who may not actively participate. (CPL 250.10 [3].)
Notwithstanding the separate legislative authorization for fitness exams on the one hand and sanity exams on the other, these are not air-tight compartments. Nothing bars an expert who examined a defendant in order to assess his trial fitness from testifying, whether on behalf of the prosecution or the defense, regarding the defendant’s mental condition at the time of the crime. Subject only to evidentiary rules of relevance and competence, information gleaned from fitness examinations may be heard by a jury assigned the task of evaluating criminal responsibility.
CONSTITUTIONAL CONSIDERATIONS
1. Notice
The express language of article 730 alerts the accused that although his uncounseled statements to the fitness examiner cannot be used at trial to prove that he is the person who committed the crime, they may be used to prove his "mental condition” when that condition has been placed in issue. (CPL 730.20 [6].)[3] Thus, this defendant cannot claim unfair surprise *192 if his uncounseled statements at the last article 730 examination are used to disprove his insanity defense and his reliance upon United States v Driscoll (399 F2d 135 [1968]) for this claim is misplaced.[4]
That the "mental condition” which can be proved by the defendant’s statements to the fitness examiner includes his mental condition during the crime is clear from the legislative history of CPL 730.20 (6). The section is based upon section 4.09 of the Model Penal Code (1985) which, in turn, expressly provides that the defendant’s statements during examinations regarding any mental condition (whether for fitness, criminal responsibility, or regarding postverdict dispositions) are admissible regarding any aspect of the defendant’s mental state (including mens rea) that has been placed in issue. (Denzer, Practice Commentary, McKinney’s Cons Laws of NY, Book 11A [1971 ed], CPL 730.20, at 336; see, Model Penal Code § 4.09 [1985], and commentary, at 265 et seq.)
2. Right To Counsel
In People v Al-Kanani (26 NY2d 473 [1970], supra), decided under the old Code of Criminal Procedure, the defendant interposed an insanity plea after he was indicted for murdering his wife. A prosecution-retained psychiatrist examined him without his lawyer’s knowledge or the court’s permission. The defendant made inculpatory remarks to the psychiatrist which were used against him at trial, both to prove that he committed the crime and that he was sane when he did so. Reversing the conviction, the Court of Appeals held that a postindictment examination conducted by a prosecution psychiatrist, as distinguished from a court-appointed expert, constitutes prosecutorial interrogation at which the defendant has a right to counsel. (People v Al-Kanani, 26 NY2d, supra, at 475.)
*193 In Lee v County Ct. (27 NY2d 432 [1970], supra), the court reaffirmed the right to counsel at a sanity examination conducted by a prosecution psychiatrist. The court held, however, that the defendant’s lawyer may neither counsel defendant’s silence at the examination nor interpose objections. Counsel’s presence at such an exam is solely to effectuate the right to cross-examine the People’s expert at trial.[5] (See, People v Hawkins, 55 NY2d 474, cert denied 459 US 846; People v Moses, 126 AD2d 755, lv denied 70 NY2d 715.)
Counsel’s role is thus limited, the court held, because a defendant who interposes an insanity defense waives his privilege against self-incrimination, at least as far as his mental condition is concerned. He cannot claim nonresponsibility for his actions because of mental disease and then preclude the People from refuting his claim: He must submit to an exam by a prosecution psychiatrist or forfeit the right to present his own psychiatric testimony at trial. His statements to the prosecution pyschiatrist are admissible, however, solely on the issue of his mental condition and not to prove that he is the person who committed the crime; the trial court must so instruct the jury. (Matter of Lee v County Ct., supra, at 441-442.) These principles were, as noted earlier, subsequently codified in the Criminal Procedure Law. (CPL 250.10 [3]; 60.55 [2]; see also, CPL 730.20 [6].)
Both Al-Kanani (supra) and Lee (supra) prevent the prosecutor’s ex parte access to the defendant. In both cases the court recognized that a psychiatric examination by a prosecution-retained expert is really an evidence gathering technique. (See, Matter of Abe A., 56 NY2d 288.) Not only can the prosecution thereby acquire evidence to prove that the defendant was the prepetrator of the crime, it also gains access to the mind of the accused for purposes of defeating his insanity defense. For that reason, the defendant is entitled to have his lawyer present, however limited counsel’s role may be, at a mental examination by a prosecution psychiatrist.
The article 730 fitness examination, by contrast, is not part of the prosecutorial evidence gathering process. Rather, the article 730 fitness examination is conducted by an independent court-designated expert in order to prevent the trial of a *194 mentally incompetent person. It is a due process bulwark against the spectacle of an insane person being forced to trial. (Pate v Robinson, 383 US 375; People v Harris, 109 AD2d 351; see, Denzer, Practice Commentary, McKinney’s Cons Laws of NY, Book 11A [1971 ed], CPL art 730, at 329.) If the article 730 exam is a compelled examination, it is compelled only by the exigencies of due process.
An article 730 examination is most commonly requested by the defendant (as it was in this case), although it may also be ordered by the court sua sponte. (People v Armlin, 37 NY2d 167, 171.) Indeed, the statute provides that the court must order an examination whenever it has reason to believe a defendant is incompetent (CPL 730.30 [1]), and the failure to do so can invalidate a conviction. (People v Harris, 109 AD2d 351, 355.) In any event, the competency examiner, far from being an agent of the prosecution, has an impartial role.
It is certainly true that article 730 examinations are typically conducted after the commencement of the criminal prosecution. And normally, the right to counsel attaches to any proceeding subsequent to the accusatorial initiative. (People v Samuels, 49 NY2d 218; People v Settles, 46 NY2d 154.) The fitness examination differs, however, from other postprosecutorial events. It is not, as noted, a prosecutorial device for gathering incriminating evidence or a form of compelled discovery (cf., Matter of Abe A., 56 NY2d 288, supra). Rather, it is conducted by an independent court-supervised physician who has no obligation or relationship to the prosecutor.
STATUTORY AND EVIDENTIARY CONSIDERATIONS
The court-appointed fitness examiner may indeed, in the course of the examination, learn things or make observations about the accused that are highly probative of his mental condition at the time of the crime. This is especially true if the article 730 exam is conducted shortly after the crime. If the physician examines the defendant within hours or days of the event, he or she may observe that the defendant was disoriented and agitated or, at the other extreme, composed or feigning symptoms. In such cases the fitness examiner may be in an excellent position to render an opinion about the defendant’s mental state at the moment of the crime and may do so if called upon to do so by either side. (See, People v Roth, 11 NY2d 80, supra; People v Draper, 278 App Div 298, affd 303 NY 653, supra; People v Watkins, 57 Misc 2d 292.) Unless the *195 physician has been retained by the prosecution, the absence of counsel at the examination is no bar to his or her opinion.
In this respect the fitness examiner is no different from lay witnesses who have observed the defendant in situations which shed light on his mental condition during the crime. The defendant’s teachers, employers or neighbors may relate to the jury the defendant’s affect and demeanor before or after the crime, or feelings he may have expressed about the victim. (See, e.g., People v Sugden, 35 NY2d 453; People v Clark, 94 AD2d 846.) Similarly admissible is testimony by psychiatric personnel who attended the defendant during past hospitalizations, whether those hospitalizations predate or postdate the crime or the accusatory process. (See, People v Kohlmeyer, 284 NY 366; People v Draper, 278 App Div 298, affd 303 NY 653, supra.) Where the accused has been found unfit to proceed, he may be hospitalized for prolonged periods until he becomes competent. (CPL 730.20 [2], [3].) Relevant observations about him or statements he made during such hospitalization are not precluded because his lawyer was not camped in the next bed.
Rather, where the fact in issue is as elusive and subtle as a defendant’s mental condition during the crime, the jury may hear relevant evidence from all qualified experts (CPL 60.55 [1]) and not just those who conduct a sanity exam pursuant to CPL 250.10. Moreover, in testifying on that issue the statute frees experts from artificial constraints; they must be permitted to state the basis for their conclusions, whether based upon hearsay, the fitness examination, a sanity examination or upon defendant’s own statements. (CPL 60.55 [1]; People v Sugden, 35 NY2d 453, supra; People v Stone, 35 NY2d 69.)[6]
The only constraints upon the testimony of psychiatrists (apart from those retained by the prosecution) are the normal rules of evidence. If an article 730 examination is perfunctory, limited to standard questions about the roles of counsel and court, then the examiner’s view of the defendant’s criminal responsibility may be irrelevant. Indeed, a bare finding of trial competence is irrelevant on the issue of sanity because the *196 standards are different. (People v Roth, 11 NY2d 80, supra.) On the other hand, the examiner may have explored the defendant’s background and the crime itself, or may have observed the defendant during prolonged hospitalization. If that examiner possesses the necessary professional credentials and is familiar with the applicable forensic standards, his or her opinion of the defendant’s criminal responsibility is not barred simply because the primary purpose of the examination was to evaluate fitness.
Cases holding to the contrary were litigated under the old Code of Criminal Procedure and reflected concerns about compromising the defendant’s privilege against self-incriminatian. (Code Crim Pro § 662; People v Roth, 11 NY2d 80, supra; People v Colavecchio, 11 AD2d 161; People v Draper, 278 App Div 298, affd 303 NY 653, supra.)[7] They have been superseded by a new statutory scheme and an appreciation of the need to explore the mental condition of one who claims that condition absolves him from responsibility for his actions.
The CPL 730 examiners in this case are highly qualified psychiatrists familiar with the applicable forensic standards for criminal responsibility. They examined Mr. McNamee at the request of the defense in order to assure the court that he remained fit to stand trial. They spoke to him shortly after he shot Dr. Rizzo and observed him for an extended period thereafter. Their observations of the defendant’s affect and demeanor and his efforts to manipulate and to feign symptoms are highly probative of his mental state at the time of the shooting. There is no constitutional, statutory or evidentiary bar to their observation testimony or to their opinion as to Mr. McNamee’s criminal responsibility for his act.

. Hereafter, the terms "sanity” or "sanity examination” are used interchangeably with "criminal responsibility” and "examinations to determine criminal responsibility.” They refer to the defendant’s mental condition at the time of the crime. The terms "fitness” and "competence”, on the other hand, denote the defendant’s mental condition at the time of the trial and his capacity to stand trial.

. "§ 658. Court order for examination as to sanity of defendant "If at any time before final judgment it shall appear to the court * * * that there is reasonable ground for believing that such defendant is in such state of idiocy, imbecility or insanity that he is incapable of understanding the * * * proceedings or of making his defense, or if the defendant makes a plea of insanity * * * the court * * * may * * * order such defendant to be examined to determine the question of his sanity.” (Added by L 1939, ch 861, § 2, elf Sept. 1,1939.)

. "When a defendant is subjected to examination * * * in accordance with this article, any statement made by him for the purpose of the *192 examination or treatment shall be inadmissible in evidence against him in any criminal action on any issue other than that of his mental condition, but such statement is admissible upon that issue whether or not it would otherwise be deemed a privileged communication.” (CPL 730.20 [6]; see also, CPL 60.55 [2].)

. United States v Driscoll (399 F2d 135) rested upon the Federal appellate court’s supervisory function rather than upon constitutional considerations. In any event the case is factually distinguishable and has been superseded by changes in the Federal rules over the past two decades. The Federal rules, like our own New York statutes, now expressly permit a defendant’s statements at fitness examinations to be considered on the question of sanity. (See, Fed Rules Crim Pro, rule 12.2 [c].)

. Both defense counsel and the prosecutor may take notes so that they can register objections at trial. A copy of the report and a transcript, where available, must be provided to both sides. (Matter of Lee v County Ct., 27 NY2d 432, 444.)

. Codifying Matter of Lee v County Ct. (27 NY2d 482), the statute provides that if the expert’s opinion is based upon the defendant’s own statement during a psychiatric interview, the court must promptly instruct the jury that those statements are to be considered solely on the issue of the defendant’s mental state at the time of the crime and not in deciding whether he is the person who committed the crime. (CPL 60.55 [2]; see, CPL 730.20 [6].)

. Section 662 of the old Code of Criminal Procedure barred jury consideration of the written fitness report. It did not preclude the examiner from rendering otherwise relevant testimony. (People v Roth, 11 NY2d 80.) In any event, section 662 was not replicated in the Criminal Procedure Law.