[960 NE2d 399, 936 NYS2d 630]

The People of the State of New York, Appellant-Respondent, v Michael Hall, Respondent-Appellant.

The People of the State of New York, Appellant-Respondent, v John Freeman, Respondent-Appellant.

Argued October 13, 2011; decided November 21, 2011

## POINTS OF COUNSEL

*Richard A. Brown, District Attorney*, Kew Gardens (*William H. Branigan* and *John M. Castellano* of counsel), for appellant-respondent in the first and second above-entitled actions. The People proved that the stun gun used in the robbery to incapacitate the victim was a dangerous instrument. (*People v Contes*, 60 NY2d 620; *Jackson v Virginia*, 443 US 307; *People v Acosta*, 80 NY2d 665; *People v Ford*, 66 NY2d 428; *People v Williams*, 84 NY2d 925; *People v Bleakley*, 69 NY2d 490; *People v Grassi*, 92 NY2d 695; *People v Norman*, 85 NY2d 609; *People v Vasquez*, 88 NY2d 561; *People v Curtis*, 89 NY2d 1003, 222 AD2d 237.)

*Legal Aid Society*, New York City (*William B. Carney* and *Steven Banks* of counsel), for respondent-appellant in the first above-entitled action. I. Defendant was deprived of his due process right to a fair trial by the court's refusal to give a missing witness charge regarding witnesses who were family members, or friends and business associates of the complainant and, therefore expected to testify favorably for the prosecution, on the ground that they were equally available to the defense. (*People v Savinon*, 100 NY2d 192; *People v Gonzalez*, 68 NY2d 424; *People v Badine*, 301 AD2d 178; *People v Creeden*, 210 AD2d 422; *People v Robertson*, 205 AD2d 243; *People v Rodriguez*, 38 NY2d 95; *People v Vasquez*, 76 NY2d 722; *People v Brown*, 34

NY2d 658; *People v Crimmins*, 36 NY2d 230; *People v Kitching*, 78 NY2d 532.) II. Defendant was deprived of his due process right to a fair trial by the prosecutor's elicitation of the underlying facts of a prior uncharged assault involving John Freeman and defendant for the purported reason of showing Freeman knew defendant previously, when Freeman had already admitted he knew defendant. (*People v Baldi*, 54 NY2d 137; *Strickland v Washington*, 466 US 668; *People v Molineux*, 168 NY 264; *People v Alvino*, 71 NY2d 233; *People v Hudy*, 73 NY2d 40; *People v Allweiss*, 48 NY2d 40; *People v Bennett*, 79 NY2d 464; *People v Sandoval*, 34 NY2d 371; *People v Schwartzman*, 24 NY2d 241; *People v Fardan*, 82 NY2d 638.) III. The Appellate Division correctly found that the People failed to adduce legally sufficient evidence that the unrecovered device as used here was a "dangerous instrument" under the law. (*People v Vasquez*, 88 NY2d 561; *People v Carter*, 53 NY2d 113; *People v Cwikla*, 46 NY2d 434; *People v Galvin*, 65 NY2d 761; *People v Ozarowski*, 38 NY2d 481; *People v Nelson*, 292 AD2d 397; *People v Maio Ni*, 293 AD2d 552; *People v MacCary*, 173 AD2d 646; *People v Richard*, 30 AD3d 750; *People v Sinatra*, 302 AD2d 615.)

*Appellate Advocates*, New York City (*William G. Kastin* and *Lynn W.L. Fahey* of counsel), for respondent-appellant in the second above-entitled action. I. The Appellate Division properly modified Mr. John Freeman's conviction because the People failed to prove beyond a reasonable doubt that the unrecovered "stun gun" allegedly used during the crime constituted a dangerous instrument, since such electronic devices vary widely in voltage, amperage, and overall capability; the complainant sustained only a temporary bruise or mark and was able to fight back immediately; and the People produced no expert or other evidence that the particular device in this case was readily capable, as used, of causing death or serious physical injury. (*Jackson v Virginia*, 443 US 307; *United States v Myers*, 972 F2d 1566; *Mann v Taser Intl., Inc.*, 588 F3d 1291; *Orsak v Metropolitan Airports Commn. Airport Police Dept.*, 675 F Supp 2d 944; *Beaver v City of Federal Way*, 507 F Supp 2d 1137; *United States v Allen*, 516 F3d 364; *Cyrus v Town of Mukwonago*, 624 F3d 856; *Bryan v MacPherson*, 630 F3d 805; *Crowell v Kirkpatrick*, 667 F Supp 2d 391; *Taser Intl., Inc. v Stinger Sys., Inc.*, 705 F Supp 2d 1115.) II. When material, available witnesses favorably disposed to the People were not called, Mr. John Freeman was denied a fair trial and the effective assistance of counsel when (a) the court refused to give a missing witness charge and instructed the jury that the defense could have called them, and

(b) defense counsel failed to request a missing witness charge as to a friend of the complainant who was present during the entire incident or to object to the court's instruction forbidding the jury to speculate about the uncalled witnesses' absence. (*Strickland v Washington*, 466 US 668; *People v Williams*, 5 NY3d 732; *People v Gonzalez*, 68 NY2d 424; *People v Baldi*, 54 NY2d 137; *People v Patterson*, 39 NY2d 288; *People v Savinon*, 100 NY2d 192; *People v Edwards*, 14 NY3d 733; *United States v Blakemore*, 489 F2d 193; *People v Kitching*, 78 NY2d 532; *People v Keen*, 94 NY2d 533.)

## OPINION OF THE COURT

Sᴍɪᴛʜ, J.

Defendants, Michael Hall and John Freeman, were accused of robbing a store and using a stun gun to incapacitate the store manager temporarily. We agree with the Appellate Division that the People failed to prove that the stun gun was a "dangerous instrument" as defined in the Penal Law, and that therefore defendants' convictions for first degree robbery and fourth degree weapon possession cannot stand. However, we sustain defendants' convictions for second degree robbery.

## I

The People's main witness was the store manager, Saidou Sow. Sow described a robbery by four men; Marcus Mitchell and Wesley Lee took cell phones from the store, while Hall knocked Sow down and dragged him outside and Freeman observed the events and shouted instructions. Hall, according to Sow, had something in his hand "like a toy gun," which he put against Sow's chest three times, producing a sensation "like a fire coming out of the toy gun." Describing Hall's third use of the stun gun, outside the store, Sow testified:

> "Mr. Freeman was at the door of the store. He was yelling to his friends to use the gun against my body so that's the time he put on me. When he put on me, I couldn't do nothing. I dropped my hand. Mr. Freeman was there yelling, put the gun on his chest, put the gun on his chest. When he done that, I couldn't move anymore."

Sow quickly recovered, however, and confronted Lee, who was coming out of the store with stolen cell phones. When Sow grabbed Lee, Freeman in turn grabbed Sow from behind, holding him while Lee hit Sow in the face three times.

A security camera in the store captured some of the scene on a videotape, which was played for the jury. On the tape, the face of the man whom Sow identified as Hall is concealed, but Freeman's face is visible, and Freeman can be seen grabbing and holding Sow while Lee hits him.

The jury convicted both defendants of one count of first degree robbery, two counts of second degree robbery and one count of fourth degree criminal possession of a weapon. The Appellate Division modified to vacate the first degree robbery and fourth degree weapon possession charges, and as modified affirmed (*People v Hall*, 79 AD3d 1068 [2d Dept 2010]; *People v Freeman*, 79 AD3d 1064 [2d Dept 2010]). A Judge of this Court granted the People and both defendants leave to appeal (16 NY3d 797, 798 [2011]), and we now affirm.

## II

Under Penal Law § 160.15 (3), a person commits robbery in the first degree "when he forcibly steals property and . . . [u]ses or threatens the immediate use of a dangerous instrument." Under Penal Law § 265.01 (2), a person commits criminal possession of a weapon in the fourth degree when "[h]e possesses any . . . dangerous . . . instrument . . . with intent to use the same unlawfully against another." A "dangerous instrument" is defined in Penal Law § 10.00 (13) as "any instrument . . . which, under the circumstances in which it is used, attempted to be used or threatened to be used, is readily capable of causing death or other serious physical injury." And "serious physical injury" is defined in Penal Law § 10.00 (10) as "physical injury which creates a substantial risk of death, or which causes death or serious and protracted disfigurement, protracted impairment of health or protracted loss or impairment of the function of any bodily organ."

■ Here, the charges of first degree robbery and of weapon possession were premised on the theory that the stun gun Hall used (at Freeman's urging) on Sow was a "dangerous instrument." Perhaps it was, but we agree with the Appellate Division that the People wholly failed to prove it.

The stun gun was not recovered, and no expert or other witness was called to explain to the jury what a stun gun is, or what it can do. The only evidence of the weapon's potential for harm came from Sow's testimony, which described pain, a burning sensation and temporary incapacitation. These are very unpleasant things to experience, but they are not "serious

physical injury" as the statute defines it. The jury had no basis for concluding that the stun gun was readily capable of killing or maiming someone, or of causing any of the other severe harms described in Penal Law § 10.00 (10).

The People's argument is that the jury could have inferred "that, if defendant had continued to use the stun gun . . . it could have caused burn scars or caused the victim to fall limp and suffer serious physical injury by striking his head on the ground or crashing into the glass counters in his store." This sort of speculation is not a permissible ground for a verdict. Of course, almost any weapon *could* cause death or serious physical injury, for example by propelling the victim into a hard or a sharp object. More proof than that is required to show that an instrument is "readily capable" of causing such consequences.

The Appellate Division was therefore correct in vacating defendants' convictions for first degree robbery and fourth degree weapon possession.

### III

Defendants claim the trial court erred in refusing to give a missing witness instruction. We agree, but hold that the error does not entitle defendants to relief, because Hall did not preserve it and as to Freeman it was harmless.

Defense counsel identified four possible missing witnesses at trial: Sow's brother, who owned the store that was robbed; Sow's cousin, the owner of a nearby store; the manager of another nearby store, Mohammed Muflhi; and Isaac Bossman. The record does not suggest that Sow's brother was at the store at the time of the crime, and we see no basis for a missing witness charge as to him, but as to the other three the charge was warranted.

According to the prosecutor's opening statement, both Sow's cousin and Muflhi were friends of Sow who saw part of the robbery. The prosecutor said:

> "Both of them watched as Michael Hall beat Saidou Sow outside of the store. Both of them watched as John Freeman directed Mike Hall to do it.

> "Both of them watched as John Freeman held Saidou so [Lee] could punch him in the face repeatedly and get away with those phones."

Sow testified that Bossman was a friend of his who was in the store when the robbery happened, and the videotape confirms

that Bossman was present. The prosecution did not call the cousin, Muflhi or Bossman as witnesses at trial.

Before the close of the People's proof, counsel for Freeman said "we will probably request a missing witness" on the prosecutor's failure to call Sow's brother, his cousin and Muflhi. He also raised the possibility that those witnesses would be made available to the defense. After some colloquy, the court addressed the prosecutor, saying:

> "[Y]ou are being put on notice that before the close of the People's case as is required the defense is indicating to the court if you don't call various people they will seek a missing witness charge at the charge conference. You can deflect that by bringing in the people and having them available to the defense. If they are equally available to both sides, then a missing witness charge is not appropriate."

After the People had rested, but before a decision had been made on whether the defense would be allowed to interview the witnesses, Hall's counsel told the court "I am now requesting the potential missing witness charge." He added, however: "Of course, if there is an opportunity tomorrow for us to have the witnesses available, I will withdraw that application." The court denied both Freeman's and Hall's applications as "premature."

The witnesses defense counsel had asked for—Sow's brother, his cousin, and Muflhi, but not Bossman—were made available to the defense. Defense counsel interviewed them, and decided not to call them.

Hall's counsel said no more about a missing witness charge, but Freeman's counsel renewed his motion for such a charge after the close of all the evidence, for the first time including Bossman as a missing witness. His application was denied. Freeman's counsel also asked to be allowed to make a missing witness argument in summation; the court responded that, if the argument was made, the prosecution "will certainly be allowed to tell the jury that [the witnesses] were equally available to the defense."

Freeman's counsel did make the argument he had foreshadowed, saying of Sow's brother and cousin and Muflhi: "They did not give assistance in this trial." A prosecution objection was sustained by the court, which then instructed the jury: "The jury is not to speculate concerning any of those individuals . . . The fact that they were not called as witnesses in this case is

not to form any part of your judgment in this matter with respect to the speculation as to what any of them may have said."

Hall's counsel also made a missing witness argument in summation, including Bossman in his list of missing witnesses; the prosecution made no objection to this argument, and the court gave no instruction about it. The prosecutor, in his own summation, argued that the defense "could have called the witnesses just as easily as I could have." The court overruled Freeman's objection to this argument, and told the jury:

> "the defense has no burden to call witnesses, but they have the right if they wished to do so . . . counsel, you could have if you wished to called any of the four witnesses to testify on your clients' behalf and you elected not to, the same as [the prosecutor] elected not to call them."

The court's rulings on this issue reflect a misunderstanding of our law on missing witness instructions.

A missing witness instruction, as we explained in *People v Savinon* (100 NY2d 192, 196 [2003]), tells a jury that it may "draw an unfavorable inference based on a party's failure to call a witness who would normally be expected to support that party's version of events." There are three preconditions to a missing witness instruction: "First, the witness's knowledge must be material to the trial. Second, the witness must be expected to give noncumulative testimony favorable to the party against whom the charge is sought . . . Third, the witness must be available to that party" (*id.* at 197).

As to Sow's cousin, Muflhi and Bossman, these preconditions were met. All three were eyewitnesses to the robbery; all three were friendly with Sow, and could have been expected to support his version of events; and all were available to the prosecution. It is irrelevant that they were also available to the defense, in the sense that defense counsel were allowed to interview them, and the defense could have called them if it chose. A missing witness instruction permits the jury to draw the common-sense inference that a failure to call a seemingly friendly witness suggests some weakness in a party's case. That inference is not rebutted when the opposing party chooses not to call the same witness—a witness who, by definition, the opposing party would expect to be hostile.

For similar reasons, the court's rulings on objections and its instructions to the jury during closing argument by Freeman's

counsel and the prosecutor were incorrect. The jury should not have been told that the absence of the witnesses "is not to form any part of your judgment." Their absence was something the jury could take into account. And the court's statement that defense counsel "could have . . . called any of the . . . witnesses" tended to obscure the point that these witnesses would normally be expected to support the prosecution's view of the case.

■ ■ The court's error, however, does not require reversal. Hall expressly withdrew his request for a missing witness instruction, in return for an opportunity to interview the witnesses in question, and he was allowed to make a missing witness argument in summation without interruption or comment. As to Freeman, the error was harmless. Freeman's participation in the robbery was recorded on videotape: he is seen in front of the store during the robbery, looking around, observing the clash between Sow and the man identified as Hall, and then grabbing and holding Sow while Lee punches him. Freeman testified in his own defense, and did not deny that he was the person on the videotape. He instead offered a ridiculous explanation, making himself first an innocent bystander and then a good Samaritan, trying to protect Lee against Sow's aggression. The evidence against Freeman was overwhelming, and we find it impossible to imagine that a missing witness charge, or different rulings on the closing arguments, would have persuaded a jury to acquit him (*see People v Crimmins*, 36 NY2d 230, 241-242 [1975]).

## IV

■ Hall complains that he was prejudiced when, during the cross-examination of Freeman, testimony was admitted about a previous assault that Hall and Freeman had committed together. We see no error.

Freeman, on direct examination, tried to minimize his connection with Hall. His lawyer asked him whether he knew Hall, to which Freeman replied: "I know his sister. I don't know Michael Hall as far as me and him, you know, we be together."

In fact, Hall and Freeman had been convicted of participating in an assault the year before the robbery—convictions that, the trial court had previously ruled, the prosecution could not bring out on cross-examination (*see People v Sandoval*, 34 NY2d 371 [1974]). The prosecution suggested, quite reasonably, that Freeman's testimony opened the door to the use of the assault

against him; but a problem presented itself because Hall, who did not testify, had not opened the door to anything. The trial judge fashioned what seems to us a fair solution: he did not allow the prosecutor to refer to the conviction, but did allow him to ask whether Freeman remembered "having a fight" along with Hall against another person. This allowed the prosecutor to attack Freeman's denial that he knew Hall well, with minimal prejudice to Hall.

Unfortunately, Freeman's answer to the question was not as carefully crafted as the court's ruling. In the course of his answer, Freeman remarked that "we all [including Hall] got locked up for so-called assaulting this guy." That testimony might have been prejudicial to Hall, but we have no reason to believe that either the prosecutor or the court saw it coming. Hindsight suggests that the prejudice might have been avoided by instructing Freeman in advance, out of the jury's presence, not to volunteer this information, but Hall did not request such an instruction, and we cannot fault the court for failing to anticipate what happened.

Defendants' other contentions are without merit.

Accordingly, the orders of the Appellate Division should be affirmed.

Chief Judge LIPPMAN and Judges CIPARICK, GRAFFEO, READ, PIGOTT and JONES concur.

In each case: Order affirmed.